LittletoN, Judge,
delivered tbe opinion of the court:
This is a suit to recover a sum of money which plaintiff alleges is due it under a contract with defendant’s National Capital Sesquicentennial Commission.
In 1947, Congress passed a joint resolution to provide for the commemoration of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in Washington, D. C. For this purpose Congress, by a joint resolution of July 18, 1947,[1] created the National Capital Sesquicentennial Commission (hereinafter referred to as the Commission). Section 4 of this resolution provided that the Commission should select an Executive Vice Chairman and might employ a director.
At the first meeting of the members of the Commission, held on March 8, 1948, an executive committee was established and authorized to act for the Commission. Mr. Carter Barron was elected Vice Chairman of the Commission at that time. The President of the United States was the ex officio Chairman. In June 1948, Mr. Edward Boykin was appointed director. Proposed plans for a sesquicentennial celebration were studied and developed during 1948-1949, and many proposals were considered.
On June 25, 1948, Congress appropriated $15,000 for expenses necessary for the Commission to carry out a program *740 of commemoration,[2] and by a joint resolution of May 31, 1949, Congress authorized the Commission to proceed with plans for the celebration.[3] But no description of the celebration was specified. This latter resolution directed the Commission to prescribe the duties of the director and provided that the Commission might delegate such powers and functions to the director as it deemed advisable.
Except for the $15,000 mentioned above, no further funds were made available to the Commission by Congress until October 14,1949, at which time an additional $3,000,000 was appropriated.[4]
One of the commemoration plans proposed and considered was known as Freedom Fair, and it was in connection with this plan that the present cause of action arose. The plan was a very elaborate one which contemplated a celebration similar in scope to a world's fair. We cannot find as a fact that the Commission directed the preparation of or approved this plan.
In July 1949, a group of private citizens interested in the creation of Freedom Fair formed an organization known as the Leasing Bureau. This group conferred with Carter Barron and agreed that the Leasing Bureau would advance $50,000 to undertake the sale of space and make a survey of the interest of industry in the proposed Freedom Fair. On July 19,1949, Carter Barron addressed a letter to Harold Schendell, a member of the Leasing Bureau, in which he stated that the letter gave the Leasing Bureau authority to contact persons interested in purchasing exhibit space in the Freedom Fair, but that no space sales contracts should be consummated until a formal contract had been entered into between the Commission and the Leasing Bureau. The letter also stated that certain conditions would have to be attached to the space sales franchise to be awarded to the Leasing Bureau. One of the conditions was that $7,500,000 worth of exhibit space would have to be sold before the Commission would incur any expense. The letter further provided that while the Commission expected to conduct an advertising *741 and public relations campaign coincident witli the Leasing Bureau’s sales campaign, the Commission would not be obligated to conduct such a campaign.
Robert E. Fowler, Associates, Inc. (hereinafter called the Fowler Corporation) was engaged in public relations work in Washington, D. C., during the period of time pertinent to this claim. Although the Fowler Corporation had had some dealings with the Commission, it did not have a contract with the Commission to do public relations work during 1948 and 1949. However, in November 1949, the Fowler Corporation was given a letter of intent signed by Barron and dated October 20, 1949, in which it was stated that the Fowler Corporation would subsequently be given a service contract in connection with the promotion of the Freedom Fair. The letter further provided that the Fowler Corporation would proceed with work under authority of the letter until it was superseded by a definitive contract.
In the late summer of 1949, prior to the writing of the aforementioned letter, several meetings were held in connection with the Freedom Fair. Among those present at these meetings were Mr. Robert Fowler, President of the Fowler Corporation, and certain members of the Leasing Bureau. It was at about this time that Fowler was asked to prepare a dummy of a brochure which would be presented to industry and used to promote the sale of exhibit space and the Freedom Fair idea. During a meeting held on about the first of September 1949, at which Fowler, Barron, and certain members of the Leasing Bureau were present, a dummy of the proposed brochure was presented by Fowler. The Leasing Bureau representatives agreed to assume financial responsibility for the manufacture of the brochures. The evidence indicates that there was an understanding that the Leasing Bureau would eventually be reimbursed out of the overall Freedom Fair publicity budget for any amount spent on the brochures, provided the Freedom Fair materialized.
Fowler then consulted with a representative of the plaintiff Corporation for the purpose of setting up specifications as a basis for obtaining prices for a brochure. The plaintiff *742 corporation was engaged in the printing and lithographing business in Washington, D. C., at that time.
On September 22, 1949, the Fowler Corporation sent to plaintiff, and to two other printers in the Washington, D. C. area, an invitation to bid on the printing of the brochures. On September 23, 1949, plaintiff submitted a bid to the Fowler Corporation. The bid was made on quantities of 10,000,15,000 and 25,000 brochures.
On September 28,1949, the plaintiff was verbally informed by the Fowler Corporation that it was the low bidder for the brochures and that a total of 25,000 would be required. Beginning on about that date plaintiff took various preliminary steps with respect to the printing of the brochures.
On October 19, 1949, plaintiff received a letter from the Fowler Corporation stating that since it had submitted the lowest bid the job was awarded to it, and that the letter would be authority to proceed with the printing of the brochures.
The Fowler Corporation included with this letter a copy of a letter dated October 18,1949, which it had received from Mr. Boykin, Commission Director, stating, that the Fowler Corporation was authorized to proceed with the production of the sales brochures. Boykin and Fowler in all these matters proceeded without express authorization or approval by the Commission.
Plaintiff proceeded with the production of the brochures involved here and in December 1949, approximately 3,500 brochures were delivered to the offices of the Commission. The Commission, without taking any action with reference thereto or as to the contract therefor, used these for information purposes, but not for selling space for the proposed Freedom Fair which was to have been the primary purpose of the brochures.
The plans for the Freedom Fair were thereafter abandoned and a different plan was accepted and approved by the Commission and put into effect. Although there were some negotiations between the Commission and the Leasing-Bureau concerning who should bear the cost of the Freedom Fair brochures, no agreement was ever reached with respect *743 to the matter and plaintiff was not paid for the work done on the brochures.
It is plaintiff’s contention that it had a contract with the Commission to manufacture the brochures, and that it is entitled to recover on the contract. On the whole record, we find no merit in this contention.
It was the Fowler Corporation which requested the plaintiff to submit a bid for the work and it was that corporation which accepted the bid. Neither Fowler nor anyone connected with the Fowler Corporation had been appointed as agent for the Commission, and the Fowler Corporation had no authority to bind the Commission in any way.
Carter Barron had no direct dealings with the plaintiff and he did not personally authorize the Fowler Corporation to issue bids to print the brochures. Furthermore, neither the Executive Committee nor the Commission specifically authorized, by a resolution or by other action, the printing of the brochures or any other expenditure on behalf of Freedom Fair. The evidence indicates that Mr. Heintz, president of the plaintiff corporation, knew that the contract was with the Fowler Corporation and not with an agency of the Federal Government. Although Boykin’s letter of October 18, 1949, apparently authorized the Fowler Corporation to proceed with the production of the sales brochures, there is no evidence that the Commission ever authorized Boykin to have the brochures printed or to expend any funds for this purpose.
In the light of these circumstances we think it is clear that the Commission was not a party to plaintiff’s contract, and therefore defendant is not liable for work done under the Fowler contract.
Of the brochures it manufactured, plaintiff delivered a total of 6,728. Although the evidence establishes that 3,500 of these brochures were delivered to and used by the Commission, the evidence does not show whether the others were delivered to the Commission, to the Leasing Bureau, or to the Fowler Corporation. Apparently the brochures were delivered by plaintiff to Fowler. The cost to plaintiff of producing the 8,500 brochures actually used by the Commission was 35 cents each, or a total of $1,125.
*744 The Commission passed a resolution to the effect that plaintiff should be paid for the brochures actually used by the Commission, and the defendant agrees that plaintiff should be paid for these brochures. Therefore, plaintiff is entitled to recover $1,125. On the record it is not entitled to recover for the remaining 3,228 brochures.
Judgment will be entered for plaintiff in the sum of $1,125.
It is so ordered.
Laeamoee, Judge,- Madden, Judge,- Whitakee, Judge; and JoNes, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Paul H. McMurray, makes the following findings of fact:
1. Plaintiff is a corporation organized and existing under the laws of the District of Columbia. In September 1949, and at least until the trial of this action, plaintiff was engaged in the printing and lithographing business in Washington, D. C.
2. Robert E. Fowler Associates, Inc. (hereinafter called the Fowler Corporation) in 1948 and for several years thereafter, was engaged in public relations work, with offices at Dupont Circle, Washington, D. C. Mr. Fowler was president and owner of practically all of the capital stock of the corporation. Edward F. Gillian was an employee of the corporation and secretary-treasurer.
3. Plaintiff’s claim herein arose under a contract with the Fowler Corporation to produce a brochure for use in selling space to prospective exhibitors in “Freedom Fair”. A World Fair was originally planned to be held as a part of the National Capital Sesquicentennial Celebration in 1950. Freedom Fair, as it was popularly called, never materialized and its production was finally abandoned about June 1,1950. Plaintiff was the successful bidder under specifications submitted by the Fowler Corporation to plaintiff and two other printers, Haynes Lithograph Company and Federal Lithograph Company. The items set forth in plaintiff’s petition and amendment thereto, constituting its claims therein, total *745 $19,038.69. An item of $265 for “Board of Trade program covers” which has been paid leaves a net claim of $18,773.69 as of August 1,1954.
4. In 1947 Congress passed a Joint Resolution to provide for the commemoration of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in Washington, D. C. For this purpose the National Capital Sesquicentennial Commission, hereinafter called the Commission, was created by Joint Resolution of Congress on July 18, 1947. (Public Law No. 203, 80th Congress, 1st Session.)
The Joint Resolution provided in part as follows:
Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That, to provide for the appropriate commemoration of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia in the year 1800, there is hereby established a commission to be known as the National Capital Sesqui-Centennial commission (hereinafter referred to as the “Commission”) and to be composed of fifteen Commissioners, as follows: The President of the United States, who shall be ex officio Chairman; the President pro tempore of the Senate and the Speaker of the House of Representatives, ex officio; three Senators to be appointed by the President pro tempore of the Senate and three Representatives to be appointed by the Speaker of the House of Representatives; three residents of the District of Columbia to be appointed by the President after receiving the recommendations of the Board of Commissioners of the District of Columbia; and three prominent citizens residents in the District of Columbia at large to be appointed by the President. The Commissioners, with the approval of the Chairman, shall select an Executive Vice Chairman from among their number (Underscoring Supplied).
Sec. 2. It shall be the duty of the Commission, after promulgating to the American people an address relative to the reason of its creation and of its purpose, to prepare a plan or plans and a program for the signalizing the one hundred and fiftieth aniversary of the establishment of the seat of the Federal Government in the District of Columbia; to give due and proper consideration to any plan which may be submitted to it; to take *746 such steps as may be necessary in the cordination and correlation of plans prepared by State commissions or by bodies created under appointment by the governors of the respective States and Territories or by representative civic bodies; and, if the participation of other nations in the commemoration to be deemed advisable, to communicate with the governments of such nations.
* * * * * * *
Sec. 4. The Commission, after selecting an Executive Vice Chairman from among its members, may employ a director and a secretary and such other assistants as may be needed to organize and perform the necessary technical and clerical work connected with the Commission’s duties and may also engage the services of expert advisers without regard to civil-service laws and the Classification Act of 1923, as amended, and may fix their compensation within the amounts appropriated for such purposes.
5. On March 8,1948, a first meeting of the members of the Commission, appointed in accordance with the above Joint Resolution, was held at the White House, and an executive committee was established and authorized to act for the Commission. Mr. Carter Barron was elected Vice Chairman of the Commission.
6. In June 1948, Edward Boykin was appointed Director of the Commission pursuant to Section 4 of the Joint Resolution of July 18,1947. Proposed plans for a Sesquicentennial celebration were studied and developed during 1948-1949. Many proposals were considered. The plan finally selected, which is not directly involved in this action, became known as Plan A and was reported to the Executive Committee of the Commission at its meeting on November 17,1949. It provided for the following items:
1. Historical Art Exhibit in the Corcoran Gallery of Art.
2. Exhibit of the Plan of Washington, under the auspices of the Commission of Fine Arts and the National Capital Park & Planning Commission.
3. American Historical Portrait Exhibit at the National Gallery of Art.
4. Various ceremonies, parades, pageants and other functions and entertainments separate and apart from Freedom Fair.
5. Historical mural around Washington Monument.
*747 6. Construction and equipment of an outdoor Amphi-theatre to be erected in Rock Creek Park.
7. Production of a Symphonic Drama composed by Paul Green.
8. Documentary Motion Picture to be based on the history of the City of Washington.
9. Historical booklets and literature including therein composition, printing, binding, and production.
7. On June 25,1848, an appropriation of $15,000 was made by Congress to facilitate a survey and to establish plans for the program of commemoration. This appropriation Act, Public Law 785, 80th Congress, reads as follows:
National Capital Sesquicentennial Commission: For expenses necessary for the National Capital Sesquicentennial Commission to prepare and carry out a program for the commemoration or the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia, as authorized by the Act of July 18,1947 (Public Law 203), including personal services in the District of Columbia; travel expenses of employees; travel, hotel, and other necessary expenses of the Commissioners; printing and binding; services as authorized by Section 15 of the Act of August 2, 1946 (5 U. S. C. 55a), at rates for individuals not in excess or $35 per diem; deposits in the Treasury for penalty mail; and rent in the District of Columbia; $15,000 to remain available during the life of the Commission: Provided, That the Commission may accept and utilize gifts of money or services from private individuals and organizations.
Congress by Joint Resolution of May 31,1949, Public Law 78, 81st Congress, 1st Session, Chapter 151, authorized the Commission to proceed with plans for the celebration. This Joint Resolution provided in pertinent part as follows:
The Commission shall prescribe the duties of the Director appointed under the authority of said joint resolution and may delegate to him such powers and functions as it shall deem advisable in order to give effect to the provisions of this joint resolution. The Director shall exercise such powers as are delegated to him by the Commission and in order to facilitate the functioning of his office may subdelegate such powers as may be deemed advisable by the Commission to those in the employ of, or detailed to, the Commission.
*748 That payment for telephone service, rents, subscriptions to newspapers and periodicals, and other similar purposes, may be made in advance; for the hire and operation of passenger-carrying automobiles in the District of Columbia; for printing and binding tobe done, in the discretion of the Commission, by establishments other than the Government Printing Office; for entertaining of distinguished visitors; and for all other expenses as may be deemed necessary by the Commission to fulfill properly the purposes of this joint resolution: Provided further, That all purchases, expenditures, and disbursements of any moneys made available by authority of this joint resolution shall be made under the direction of the Commission in accordance with law. [Italics supplied.]
8. Except for the appropriation of $15,000, made under Public Law 785,80th Congress, no funds were made available by the Congress to carry into effect the general plans of the celebration until October 14, 1949.
An additional appropriation of $8,000,000 was made on October 14, 1949, to carry into effect the objects of the Commission in the following language:
NATIONAL CAPITAL SESQUICENTENNIAL COMMISSION
For expenses necessary for the National Capital Sesquicentennial Commission to prepare and carry out a program for the commemoration of the one hundred and fiftieth anniversary of the establishment of the seat of the Federal Government in the District of Columbia, as authorized by the Acts of July 18, 1947 (Public Law 203), and May 31, 1949 (Public Law 78), including personal services and rent in the District of Columbia; services as authorized by section 15 of the Act of August 2, 1946 (5 U. S. C. 55a); and such construction or other expenses as may now be authorized by law; $3,000,000. (Public Law 358, 81st Cong.)
9. A group of private persons including Harry Flaxman, Baymond Topper, Paul Alexander and Harold Schendell, who were interested in the creation of “Freedom Fair”, formed an organization known as the “Leasing Bureau” in July 1949. This group negotiated with Carter Barron and agreed that the Leasing Bureau would advance $50,000, to undertake the sale of space and make a survey of the interest of industry in the proposed Freedom Fair. On July 19, *749 1949, Carter Barron addressed a letter to Harold Schendell as follows:
This letter is to supplement my letter to you of even date which was written you to indicate to prospective space buyers your authority to contact them and to determine their interest in purchasing exhibit space in the Freedom Fair until such time as a formal contract has been entered into with you in line with the conditions enumerated hereinafter. It is, of course, understood by you and your associates, Messrs. Harry Flaxman, Raymond Topper and Paul Alexander, that no space sales contracts are to be consummated by you until a formal agreement has been entered into between your group and representatives of the National Capital Sesquicentennial Commission.
It is the plan of the Sesquicentennial Commission to incorporate a managing corporation to handle all business activities connected with the Sesquicentennial and the Freedom Fair. The contract granting to your group exclusive franchise to handle space sales will be negotiated and signed with this managing corporation.
As we have pointed out to you in conferences, certain conditions must be attached to this space sales franchise to be awarded to your group, namely:
1. The Commission or the managing corporation cannot incur any expense, including commissions, in connection with the sales unless and until a minimum of $7,500,-000 worth of space sales have been completed. This amount will cover the minimum construction and other costs necessary to build the required exhibit buildings and to assure that the Freedom Fair can be operated as planned. When you have sold $7,500,000 worth of exhibit space, you will then be entitled to be paid a commission of 4% on the money received to that date under such sales.
2. In granting you an exclusive sales franchise without a time limitation, the Commission must protect itself by clauses to the effect that the franchise can be can-celled unless the sales are prosecuted vigorously by your group and unless minimum sales are completed as follows: (a) Sales totalling $4,000,000 within ninety days from date of signing of the contract with your group, and (b) minimum sales of $1,000,000 per month thereafter.
3. Your franchise covers the sale of exhibit space only to American business and labor unions in the Ü, S, and A buildings. In consideration for your services, and *750 subject to limitations herein, it is agreed that you will be compensated at the rate of 5% commission on the gross sales. The amount to be charged for the space to be sold by you shall be at the rate designated by the Commission.
It is our understanding that you and your associates intend to form a corporation and, in such case, you shall have the right to turn over this agreement to such corporation.
It is agreed between us that for the 5% commission to be paid by the Commission or the managing corporation, you will do all things necessary to obtain the sales contracts, at your own expense, except the cost of expense of advertising. The Commission or its managing corporation expects to conduct an advertising and public relations campaign coincident with your sales campaign, but will be restricted by the amount of money available for such purposes, it being understood that neither the Commission nor the managing corporation will be obligated to conduct such a campaign. We, of course, shall lend whatever assistance we can in aiding your sales promotion. The form of exhibitors’ contracts shall be first approved by this Commission before used by you.
Of necessity, we agree that you shall have the right to allocate all available space to such exhibitors as you shall obtain, subject to approval of representatives of the Commission and the managing corporation. No contracts for exhibit space shall be final until approved by the Commission and the Commission shall have full authority to establish general standards and regulations governing allocation of space and general standards for all exhibits.
Checks for space purchases shall be made payable to the Commission or the managing corporation as will be determined later.
10. During 1948 and 1949 the Fowler Corporation secured the right to manufacture and sell certain commodities under license from the Commission.
These contracts are summarized as follows:

Date secured

(a) Souvenir Book, Percentage of Sales Basis, Advance Payment, $2,500_Dee. 30, 1948
(b) Scarfs, Percentage of Sales Basis_Mar. 10, 1949
(e) Luncheon Sets, Percentage of Sales Basis-Mar. 30, 1949
(d) Handkerchiefs, Percentage of Sales Basis_Mar. 30, 1949
11. Neither Fowler nor the Fowler Corporation obtained a written contract with the Commission to do public relations work in 1948 and 1949, However, the Fowler Corpo *751 ration was given a letter of intent by the Commission, dated October 20, 1949. The letter referred to a proposed service contract for public relations, publicity and advertising in connection with the National Capital Sesquicentennial Celebration and promotion of “Freedom Fair”, sometimes referred to as Plan B. It was not delivered to the Fowler Corporation until sometime in November 1949.
12. The brochures involved in this action were discussed at a meeting with Mr. Schendell and representatives of the Leasing Bureau in connection with Freedom Fair in the late summer of 1949. There were several meetings at which representatives of the Leasing Bureau and representatives of Gardner Displays of New York, Inc., and the Byrne Organization, Inc., were present. Fowler was asked to prepare a dummy of a brochure which could be presented to industry and used to promote the sale of exhibit space and the Freedom Fair idea. Mr. Barron, Mr. Schendell, Mr. Flaxman, Mr. Bernstein, Mr. Fowler and others held a meeting at Mr. Barron’s office about the first of September 1949. A dummy of the proposed brochure was presented by Fowler at that meeting. The Leasing Bureau representatives during the discussion agreed to put up $50,000 to start the operation of the Leasing Bureau. The Leasing Bureau agreed to assume immediate financial responsibility for the brochure and it was understood that they would ultimately be reimbursed and that the advance would be charged back against an overall Freedom Fair Public Relations budget, provided the Freedom Fair materialized.
13. Fowler and the Fowler Corporation had performed considerable work in connection with the Sesquicentennial celebration and the Freedom Fair plans. Fowler had expended some of his own money. He informed those present at the above-mentioned meeting held in the summer of 1949 (finding 12) that before he would do anything further, which involved the outlay of cash, someone would have to pay him the money he had spent for art work, preliminary lay-out work, copyright and other format work to be given him. He said that this would not exceed $2,300. Flax-man and Schendell agreed to advance this money for that *752 purpose and about September 6, 1949, gave him a check for that amount.
14. Fowler consulted with a Mr. Shepherd who was a salesman for the plaintiff corporation for the purpose of setting up specifications as a basis for obtaining prices for the brochure.
On September 22, 1949, the Fowler Corporation sent to plaintiff, and two other printers in the Washington, D. C., area, an invitation to bid on the printing of the brochure. No public advertisement to bid was made.
The letter, signed by Edward F. Gillian, as secretary-treasurer of the Fowler Corporation, and identical in form sent to each of the proposed bidders, was as follows:
Attached hereto are specifications for the Freedom Fair sales brochure which we have designed and will produce for the National Capital Sesquicentennial Commission.
We should like to have a bid from your company on this job, based on the attached specifications.
Endeavor is being made to produce this brochure as promptly as possible. Bids should therefore reach this office not later than noon on Tuesday, 25 September.
15. On the next day, September 23,1949, the plaintiff corporation submitted a bid to the Fowler Corporation. The bid was made on quantities of 10,000, 15,000, and 25,000 brochures. The bid went into great detail and indicated that a considerable amount of work had been done on the proposed brochure. Some planning or negotiations had been conducted by plaintiff’s salesman, Shepherd, with the Fowler Corporation prior to the date on which bids were actually received.
On September 28, 1949, the plaintiff was verbally informed by the Fowler Corporation that it was the low bidder for the brochure and that the number of brochures required would be 25,000.
16. Plaintiff’s records show that beginning on September 28, 1949, and continuing for a period of several days thereafter, plaintiff took various preliminary steps with respect to the printing of the brochure. This included ordering printing stock, fly leaves, and other components of the bro *753 chure. Mucli of the preliminary production work on the brochure was done during this period. A delivery of paper to be used for the brochure was received by plaintiff on October 7,1949.
17. During the period which included September and October 1949, Fowler was proceeding, in his dealings with plaintiff, on the assumption that a contract with the defendant would be forthcoming. He was subsequently given a letter of intent and a promise of a contract. The Fowler Corporation letter (finding 14) requesting plaintiff’s bid stated in part: “* * * Attached hereto are specifications for the Freedom Fair sales brochure which we have designed and will produce for the National Capital Sesquicentennial Commission * * Plaintiff’s job orders contained the name of the Fowler Corporation as its customer for the order. Plaintiff’s work sheets show that until as late as November 21,1949, orders received by the plaintiff were made out in the name of the Fowler Corporation.
18. Plaintiff received the following letter on October 19, 1949, from the Fowler Corporation:
Receipt is acknowledged of your letter of September 23, 1949, which contained bid of your company for printing of the Freedom Fair Sales Brochure.
We have pleasure in advising you that since Williams & Heintz has submitted the lowest bid, the job is hereby awarded to your company.
This will be your authority, therefore, to proceed with the printing in accordance with verbal instructions, etc., as provided by Mr. Fowler.
Bills for this job should be submitted to this company in triplicate.
The Fowler Corporation included with this letter of October 19,1949, a copy of the following letter, dated October 18, 1949, from Mr. Boykin to Robert E. Fowler Associates:
GeiítlemeN : This will authorize you to proceed with the production of the sales brochure for use in selling exhibit space for the Freedom Fair.
At the same time, this authorizes you to proceed with the preparation and production of stationery for the Freedom Fair.
*754 19. The authorization from Boykin to proceed with the production of the brochure was interpreted by Fowler, who received it, and also by plaintiff who was furnished a copy, to encompass all of the steps necessary in making or producing a completed product, namely, the approved type of brochure.
20. The brochure was to be used in an attempt to interest industry in the sale of exhibit space in Freedom Fair. This was the understanding of both Carter Barron and Boykin. Heintz knew this was the purpose of the brochure but expected that the Commission would accept responsibility for its printing.
21. There was no adequate appropriation to bring Plan A or Plan B into being until October 14, 1949, when Plan A was authorized. There was a meeting of the Commission in June 1949 but no meeting of the Executive Committee was called until after October 14,1949, when Congress appropriated $3,000,000 for expenses to carry on the purposes of the National Capital Sesquicentennial Commission. Mr. McGarraghy, Chairman of the Executive Committee, requested Boykin to call a meeting of the Executive Committee, which was held on November 17,1949.
Carter Barron had no direct dealings with plaintiff. Barron did not personally authorize the Fowler Corporation to issue bids to print the brochure. There is evidence to the effect that Barron was surprised when he was informed 25,000 brochures had been ordered. The Commission never allocated any money to print the brochure. It is not established that the Executive Committee of the Commission specifically authorized Boykin to order the brochures.
All contracts with the Commission had to be submitted to the Executive Committee for approval.
The contract for the printing of the brochure was a contract between the Fowler Corporation and plaintiff. During this period the Fowler Corporation was doing business with various people interested in Plan B. Neither the Commission nor Boykin ever constituted Gillian or Fowler purchasing agents for the Commission.
Fowler, having received $2,300 from the Leasing Bureau for the material costs of the brochure and oral agreements *755 from the representatives of the Leasing Bureau to advance payment for printing the brochure, expected the cost of the printing would be met by them. He further understood that if Plan B became operative through the selling of $7,500,000 worth of space in Freedom Fair to exhibitors by the Leasing Bureau, the Commission would absorb the cost of printing of the brochures in accordance with the letter of intent issued by Carter Barron to the Leasing Bureau on July 19, 1949.
22. Neither the Executive Committee nor the Commission specifically authorized, by a resolution or other special action, the printing of the brochures or any other expenditures on behalf of Freedom Fair, Plan B. Mr. Heintz, president of the plaintiff corporation, knew that he had a contract with the Fowler Corporation to print the brochures and that he had not contracted with an agency of the Federal Government to do the work. Heintz knew that Gillian was associated with the Fowler Corporation and thought that agency had a contract with the defendant.
23. Of the items listed in the petition and amended petition plaintiff was paid for the following items:
Freedom Fair news release_$175.00
Board of Trade Program Covers_ 265.00
The remaining items are either for the printing of the brochure itself or for related items. These items were not paid for by the Commission. Mr. Courtland Stott was appointed accountant of the Commission on October 30, 1949. The first time plaintiff presented any of the invoices for the printing of the brochure or related items to the Commission for payment was in January 1950. Stott concedes plaintiff may have presented invoices for those items to the Fowler Corporation for payment prior to that time.
24.Although Courtland Stott, as certifying officer, refused to certify for payment the items invoiced relating to the brochure in the petition, he did certify four bills which were presented by the plaintiff to the Commission, and caused these to be paid. Those paid were all related to Plan A for which there was an appropriation set apart by the Commission. These bills were:
*756 1. Salute to Freedom Programs-$470.00
2. Board of Trade Program Oartons_ 265.00
3. Special Exhibits Tickets_ 125.00
4. Ground Breaking Tickets_ 21.00
25. In December 1949 approximately 3,500 brochures were delivered to the offices of the Commission and were used by it for information purposes, as distinguished from the primary purpose of the brochures, that is, selling space for the projected building of Freedom Fair.
26. Mr. Paul Massman, who in January 1950 had been appointed General Manager of the Commission, and Mr. Courtland Stott, its accountant, made an effort to secure payment for the printing of the brochures, and suggested that the Commission pay one-half of the cost of printing the brochures. Representatives of the Commission and the Leasing Bureau made an attempt to negotiate a contract, the terms of which would have provided for the assumption by the Commission of the payment of one-half of plaintiff’s invoices for the brochures. It was suggested to plaintiff that it should resubmit the previously submitted invoices, and that the charge on the corrected invoices should be 50% of the invoices to the National Capital Sesquicentennial Commission and 50% to the Leasing Bureau and it was suggested that these corrected invoices should be submitted to the Commission for approval.
Plaintiff resubmitted the invoices for the printing of the brochures and incidentals relating thereto in January 1950.
27. To implement the submission of bills jointly to the Commission and the Leasing Bureau, Courtland Stott on May 9, 1950, wrote plaintiff confirming a conversation between himself and a representative of the plaintiff as follows:
This will confirm a conversation between the writer and Mr. Shephard concerning the action to be taken with respect to the proper settlement of the cost involved in the sales brochure which was printed as a joint venture for this Commission and the National Capital Leasing Bureau, Inc.
All of the invoices comprising the costs will be assembled into a single voucher and distributed on a 50-50 basis between this Commission and the Leasing Bureau and a recommendation will be made through our General Manager to the Executive Committee that:
*757 (1) This Commission immediately pay y2 of the total amount due.
(2) Immediately bill the Leasing Bureau for the remaining y2.
(3) If and when such collection is made from the Leasing Bureau, it will be paid over to your company.
If you have any objections to the above-outlined procedure, kindly notify the writer immediately. In the meantime, we will proceed as stated above.
28. In January 1950, while negotiations were going on between the Leasing Bureau and the Commission looking to a contract, the following invoices were billed by plaintiff, one-half to the Commission and one-half to the Leasing Bureau:
6728 Brochures and Extras_$4,623.86
25000 Labels for Brochures_ 45.38
30000 Labels in Color for Brochures_ 504.00
The above-mentioned plan for the Commission to undertake one-half of the cost was never approved by the Commission.
29. During November and early December 1949, there were meetings of a group who were interested in the furtherance of Freedom Fair. These included persons interested in the general design, building and engineering and the sale of space. These men met with Boykin, Carter Barron — when he was available — Stott, and other paid employees of the Commission. These meetings were called Staff Conferences. At the Staff Conference of November 28,1949, the brochure was, among other things, brought up for discussion. Inquiry was made of Fowler as to when the brochure would be ready for use by salesmen of the Leasing Bureau, in their canvass of industry to determine the feasibility of Freedom Fair. Representatives of the Leasing Bureau requested an initial delivery of 9,000 copies of the brochure for this purpose. Fowler promised delivery on December 7, 1949. Fowler in turn asked if the original request of the sales organization (Leasing Bureau) for 25,000 brochures should still stand. No change in this order was suggested. Fowler was asked by Maybruck, the financial advisor to the Commission, if the brochure was designed principally as a selling device or if it would also be used for public information. Fowler *758 stated that the brochures were too expensive to be used for mere public information purposes, that they would cost about 35 cents apiece and that it had been planned chiefly for selling space to industry.
30. After the letter of intent to the Leasing Bureau was signed by Carter Barron on July 19, 1949, negotiations toward formalizing it into a contract were begun and continued between representatives of the Leasing Bureau and of the Commission until Freedom Fair was abandoned on June 1, 1950. These negotiations included consideration of the payment of plaintiff’s invoices by the defendant for the production of the brochures and material pertaining thereto, which is the subject matter of this litigation.
During these negotiations, consideration was given to a provision for the division of expenses for the brochure. The Commission contended that they were not obligated to asume this expense under the letter of intent to the Leasing Bureau. The Leasing Bureau contended they would not undertake the cost of the brochure unless it was divided between the Commission and the Leasing Bureau. Plans for holding the Freedom Fair were never completed. A contract between the Leasing Bureau and the Commission was never signed. During 1949 there were numerous changes in the plans and, finally, the contract negotiations were discontinued when the plans for Freedom Fair were abandoned.
31. The plans for the celebration known as Plan A were carried into effect generally as presented to and budgeted by the Executive Committee.
From November 17,1949, through June 1950, the Executive Committee took the position that no steps could be taken by the Commission with regard to Plan B, Freedom Fair, until the legality of holding it was ascertained. Walter Bastían was appointed General Counsel about January 1950. He obtained a ruling from the Attorney General in May 1950 that there was no authority under the enabling legislation to hold the planned Freedom Fair. (An oral opinion of similar import had been given to Carter Barron in November 1949). On June 1,1950, the Commission voted to abandon Freedom Fair and devote itself to the ceremonial program, Plan A.
*759 From the middle of February 1950 on, Boykin limited his activity primarily to carrying forward Plan A. Events contemplated in the program for Plan A, above mentioned, were developed and held. Included among these projects were the Carter Barron Amphitheatre which was built in Bock Creek Park and a symphonic drama which was held there during the late summer and fall of 1950.
32. Fowler Corporation was given a letter of intent signed by Barron as Executive Vice President of the Commission. The letter of intent, dated October 20, 1949, is as follows:
This is a Letter of Intent to inform you that the National Capital Sesquicentennial Commission will award you a service contract for all public relations, publicity and advertising services in connection with the National Capital Sesquicentennial celebration and the promotion of the Freedom Fair.
This letter of intent, upon your acceptance, shall be effective as of October 20,1949, and you are authorized and directed as of said date to proceed with the work. The definitive contract will be executed as expeditiously as possible. Such definitive contract, when executed, shall supersede this Letter of Intent, but all work done under this Letter of Intent shall be deemed to have been done under such definitive contract.
Payments under this Letter of Intent may be assigned purusuant to the Assignment of Claims Act of 1940, and will not be subject to reduction or set off for any indebtedness from you to the United States arising independently of this contract.
All contract provisions required by law to be incorporated in contracts of this kind are by this reference incorporated in the Letter of Intent.
If this Letter of Intent is satisfactory to you, please so indicate by signing in the space provided for acceptance on the original and one of the enclosed copies, and by returning such signed original and copy to this office immediately. Thereupon this Letter of Intent shall constitute an agreement between you and the National Capital Sesquicentennial Commission until the execution of the definitive contract.
Boykin testified that four (4) unsigned letters of intent, including the one to the Fowler Corporation, were given him a few days after October 14,1949, to have Carter Barron sign for the Commission. Boykin had a conversation with *760 Barron, after which he kept the letters on his desk for four or five weeks before they were taken from his desk. The four letters were dated October 20, 1949, but were not signed by Barron until at least a month later. The letter addressed to the Fowler Corporation has a statement “Accepted as of October 20, 1949” immediately above Fowler’s signature.
33. During January 1950 members of the Commission concluded that it was not proper for Fowler, and the Fowler Corporation, to have financial interests arising out of contracts with the Commission by which the Commission licensed the Fowler Corporation to manufacture and sell various commodities having to do with the Commission and at the same time to enter into a contract to be its Public Bela-tions Director. Negotiations were conducted with Fowler and the Fowler Corporation to terminate the contracts existing between the Commission and the Fowler Corporation and to enter into a personal service contract by which the Commission would employ Fowler and certain of his personnel including Gillian. A personal service contract was entered into with Fowler on February 21, 1950. Simultaneously with the execution of this contract, an additional contract was entered into between Fowler and the Commission approving the letter of intent heretofore referred to (finding 32) and at the same time cancelling all rights Fowler or his corporation had thereunder.
At the same time all other contracts existing between the Fowler Corporation and the Commission were cancelled and the Commission agreed to pay the Fowler corporation monies which Fowler represented were due the Corporation as of that time. The Fowler Corporation was paid $7,092 in addition to the sum of $10,000 which had theretofore been advanced to it by the Commission for expenses incurred under the letter of intent.
34. James B. C. Howe, a lawyer who had been assigned to the Commission on a part-time basis by the White House, conducted the Fowler personal service contract negotiations for the Commission. Fowler disclaimed any liability for the cost of printing the brochure and asserted that this was the responsibility of the Leasing Bureau.
*761 There had been negotiations pending between the Leasing Bureau and the Commission for a definitive contract following the delivery to the Leasing Bureau of a letter of intent by Carter Barron. Howe was also conducting these negotiations for the Commission. One of the provisions considered for inclusion in the proposed contract would have required the Commission to assume one-half of the cost of the brochures. This proposal, although it met with the approval of Massman and Scott, employees of the Commission, was put in the Leasing Bureau draft contract subject to the Commission’s approval.
In view of these negotiations and Fowler’s disclaimer of liability, Howe did not believe it was necessary to refer to the cost of the brochures in the Commission’s contract with the Fowler Corporation and Fowler, and he did not do so.
On February 1,1950, upon the appointment of Mr. Walter Bastían as General Counsel of the Commission, the plaintiffs’ claim was referred to him and Mr. Howe for consideration. The claim was not allowed and the plaintiff filed its claim with the General Accounting Office.
After the plaintiff filed its claim with the General Accounting Office the Commission prepared its report concerning the claim. This report was prepared by Mr. Howe and Mr. Bastían and was submitted for the consideration of the Commission. At a meeting of the Executive Commission the plaintiff’s claim was discussed and it was determined by the Commission that the plaintiff had no legal claim and thereupon the Commission took into consideration that a number of the brochures which had been delivered were actually taken over by the Commission for distribution. The Commission then passed the following resolution:
Motion by Mr. Fleming, seconded by Commissioner Young, and unanimously carried, that the letter covering the Williams & Heintz claim be approved with the understanding that paragraph 2 on page 15 be amended to read “recommends a settlement in favor of the claimants to the extent that United States may have actually used any of the brochures for a purpose other than that covered by the arrangement between the Commission and the National Capital Sesquicentennial Leasing Bureau, Inc.”
*762 The Commission referred the claim to the General Accounting Office on August 17,1950. The General Accounting Office disallowed plaintiff’s claim in its entirety.
35. A total of 6,728 completed brochures were delivered by the plaintiff. Of these, 3,500 were delivered to the Commission. It is not clear from the evidence whether the others were delivered to the Commission, the Fowler Corporation, o.r the Leasing Bureau.
After plaintiff was requested to divide the charges equally between the Commission and the Leasing Bureau, the following invoice was prepared under date of January 20,1950, and submitted to the Commission.
FREEDOM FAIR Sales Brochure (Partial Billing)
Per original contract — 6,728 Brochures (delivered to Jan. 16,1950) @ $631.00 per 1,000_$3,945.36
Extra for plastic binding — 6,728 extra binding @ $26.30 per 1,000_ 176.95
Typography and incidental photostats_ 501.55
4, 623. 86
This invoice divided as follows:
Nat’l Capital Sesquicentennial Commission — 50%
Nat’l Capital Sesquicentennial Leasing Bureau Inc. — 50%
Charge to Commission_ 2,311.93
The following record was prepared by the Fowler Corporation, with respect to the above-quoted invoice as of January 27, 1950.
27 January, 1950.
Payment Request No. 41.
(Williams & Heintz Co.)
For brochures as per attached invoices (their bill 1/20/50), 1/2-$2,311.93
Submitted
[signed] Edward F. Gillian,
EDWARD F. GILLIAN
Countersigned:
Robert E. Fowler,
Robert E. Fowler.
36. Under date of May 5, 1950, the plaintiff resubmitted “Past Due Invoices” to the Commission, as requested by Mr. Massman, General Manager of the Commission, in the manner suggested by Courtland Stott, the accountant for the Commission. By the time plaintiff was notified that the plan, which originally contemplated use of the brochures, was abandoned, he had completed slightly more than one-fourth of the total order. This explains the separation of *763 the total charge to distinguish between the bound and unbound brochures. These invoices are summarized as follows:
Brochures Complete — Per Original Contract — 6,728 Brochures (delivered to January 15,1950) @ $631.00
per 1,000_$3,945.36
Extra Plastic Binding — 6,728 Extra binding @ $26.30 per 1,000_ 176.95
Typography and incidental photostats- 501.55
4,623.86
Brochures Unbound Awaiting Completion instructions — 18,272 Copies @ $631.00 per 1,000- 11, 529. 63
Less Cost of Original Binding at $48.00 per 1,000- 877.06
10,652. 57
3,000 Labels for Mailing Brochures_ 504.00
25,000 Cartons_ 1,012.50
500 Floor Plans_ 366. 05
25,000 Labels for Mailing Permit for Brochures- 90. 75
1,973.30
Total_ 17,249.73
The difference between the above total and the amount of $19,038.69 claimed in the plaintiff’s amended petition involves an item of $265 for Board of Trade program covers for which plaintiff has received payment and the following additional items:
Typing labels, wrapping and mailing sales brochure_$705.13
Storage charges on the undelivered unbound brochures to August 1, 1954, @ $20.52 per month- 818.83
37. The actual expenses incurred by plaintiff were as follows:
1. Cost of producing the brochures @ 35<J each-$8, 750.00
2. Other items listed in finding 36- 1,973. 30
3. Storage charges- 818.83
Total_ 11, 542.13
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States one thousand one hundred twenty-five dollars ($1,125).

 The pertinent part of this resolution is quoted in.finding 4.

 This Act is quoted in finding 7.

 The pertinent part of this resolution is quoted in finding 7.

 This Act is quoted in finding 8.